UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | |
| | : | Cr. No. 05 - 364 (EGS) |
| | : | |
| KENNETH C. BAKER | : | |
| | : | |
| Defendant | : | |

MOTION *IN LIMNE* TO
<u>PRECLUDE THE TESTIMONY OF MS. DORIS MEDLEY</u>

Kenneth C. Baker, by and through undersigned counsel, moves to preclude the

introduction of Ms. Doris Medley's testimony at the trial of Mr. Baker.  Based on the

information now known to the Court it is evident that Ms. Medley is not competent to proffer

relevant testimony.  Mr. Baker makes this motion pursuant to the Sixth Amendment to the

United States Constitution as well as Rule 12(3)(c), and 47 of the Federal Rules of Criminal

Procedure.  In support of this motion, Mr. Baker states the following:

Unfortunately, Ms. Doris Medley suffers from dementia – a progressive brain

dysfunction.  Dementia has caused Ms. Medley to be unable to differentiate between reality and

fiction. Mr. Baker is charged by indictment with *inter alia* defrauding Ms. Doris Medley.  These

charges are based in large part on the accusations of bank employees and FBI Agent Charlie

Price.  Mr. Baker was an employee of Sun Trust Bank.  While performing his duties he helped

Ms. Medley open a new bank account.  Mr. Baker presented the application to the appropriate

banking officials who then caused an account to be opened for Ms. Medley.

Shortly after a brokerage account was opened for Ms. Medley, Ms. Ruqiya Akhdar

opened a new account using a check signed by Ms. Medley. Ms. Akhdar represented to Mr.

Baker and other bank employees that Ms. Medley was either her godmother or her grandmother.

Based on Ms. Akhdar's representations the bank opened a new account for Ms. Akhdar. Ms.

Akhdar immediately began withdrawing funds from her new account. A few days later,

according to Ms. Akhdar, she and Ms. Medley had a disagreement and Ms. Akhdar informed Mr.

Baker that she wanted the money in her account returned to the account of Ms. Medley. Mr.

Baker followed Ms. Akhdar's instructions.

At some point employees of Sun Trust Bank began investigating the aforementioned

transactions. Ms. Medley was contacted by bank officials and thereafter caused a complaint to

be filed. Ms. Medley did not initiate contact with the bank. The bank investigation led to an

investigation by the FBI and then by the United States Attorney's Office. During the

aforementioned investigations, Ms. Medley was interviewed by several different people who's

investigative techniques may have led Ms. Medley to believe that she was defrauded. When

questioned Ms. Medley had to ask the government attorney what they believed had happened to

Ms. Medley's money. (Transcript of the Videotaped Deposition of Doris Medley p. 37). It is

most likely that the basis of the relevant portions of Ms. Medley's testimony is actually Ms.

Medley repeating what has been said to her by those who interviewed her.

The Court may recall that on December 22, 2005, Ms. Medley gave testimony that was

videotaped. The government requested that Ms. Medley's testimony be preserved for trial

because she is in poor health. While Ms. Medley was testifying it became clear that she was not

able to distinguish reality. Dr. Carole Giunta, observed the testimony of Ms. Medley and has

concluded that due to her illness Ms. Medley cannot distinguish between fact and fiction.

During Ms. Medley's testimony there were several occasions on which Ms. Medley was clearly unable to distinguish between what was real, imagined or simply untrue.  For example: Ms. Medley repeatedly claimed to be 100 years old, this assertion is not supported by the facts. Additionally, Ms. Medley was not able to say what year it was, or what month of the year it was. Furthermore, although Mr. Baker was present in the Court room Ms. Medley was not able to identify him.  She also failed to properly identify Agent Charlie Price, who is the lead agent on this case and has met Ms. Medley.  There are many other examples of the Ms. Medley's inability to distinguish reality from fiction:

> Q.    Now Ms. Medley how old are you?
> A.    I will be 100 years old the 25th of this month.
> Q.    Can you tell us what your date of birth is?
> A.    July 24, 1916.

(Transcript of the Videotaped Deposition of Doris Medley p. 10-11).   It is evident from her answer that she would not be 100 years old on the 25th of December, 2005.

> Q.    Now, let me ask you this.
>        When was the last time you went out of your home alone, do you remember?
> A.    All the time.  I don't have nobody with me.
> Q.    Do you go out alone, though, or does someone come and get you and take you out?
> A.    No, unless I have a friend that's going downtown.  But ordinarily I just go alone. I was taught he who travels alone travels fastest.

(Transcript of the Videotaped Deposition of Doris Medley p. 20).  At the time of her deposition Ms. Medley had been transported to the Court and had been accompanied by a caregiver.  It was abundantly clear that she was then unable to get around on her own.  Thus, her statement that she leaves her house alone all the time could not possibly be true.  Yet she believes it to be so.

The questioning of Ms. Medley regarding a cane was indicative of the manner in which

Ms. Medley processes information.  Government counsel asked Ms. Medley a number of

questions about a cane and who gave her the cane.

> Q.     Well let me ask you this.
>        You talked about the cane which you call your what?
> A.     I was in the grocery store one day.  And a lady, I don't know who she was, said,
>        honey, where's your husband?  I said, he's in the cemetery.  He was.  She said,
>        no, I mean, your cane.
>        And that was given to me by Mr. Ken.  He brought me that cane to the house one
>        night.
> Q.     Okay. And who did you say it was?
> A.     Ken.
> Q.     Ken?
> A.     Uh-huh?
> Q.     And can you tell the Court --
>        Do you know Ken's last name?
> A.     No.
> Q.     Do you remember when it was that Ken brought you the cane to your house?
> A.     It was in the spring, like in April or something.  The same year that I lost my
> papers and everything.  It's been about four or five years ago now.

(Transcript of the Videotaped Deposition of Doris Medley p. 24).  Ms. Medley claimed that a

man named Ken gave he a cane four to five years ago.  That would have to have been in 2000 or

2001.  That is not within the time frame given in the government's affidavit nor is it within the

time that Mr. Baker worked at Sun Trust Bank.  Therefore Ms. Medley is either purposely

misleading the Court or she does not know what is true.

Ms. Medley was also asked a number of questions about her bank, Sun Trust Bank, and

its location and the people at the bank with whom she came into contact.  Ms. Medley indicated

that she would visit a bank on Bladensburg and would see Ms. Cloud.  She also indicated that the

person named Ken came to her home because of credit cards.  Ms. Medley also indicated that

Ms. Cloud is now dead. (Transcript of the Videotaped Deposition of Doris Medley p. 54).

According to discovery provided by the government Ms. Cloud left Sun Trust Bank for unrelated

reasons.

> Q.    Let me ask you this.
> Getting back to when this person named Ken came to visit you, do you remember how many times this person named Ken came to visit you?
>
> A.    He only came about twice.  Because he came - - I'll tell you why he came. Because I had, you know, these little credit cards, you know, they send you from the stores.  I had a little pile of them.  And these two people came to my house.  They had taken me to Maryland to the – Virginia to the bank - - to grocery shop.  They said can we go to the bathroom.  I said, yeah, what do you want me to do, go for you?  And they went upstairs.  Not Ken.  He had nothing to do with it.  And I heard them bumping around.  So finally they came downstairs.  And I went upstairs and all my cards were gone.  So I said, where's my cards?  He said, we got to report this.  And he took me to the police over on Bladensburg Road.  He took me up there and reported it.

(Transcript of the Videotaped Deposition of Doris Medley p. 29).  Again, the question was not responsive to the question posed by the government and the answer contained information that was simply untrue.  Although counsel has attempted to investigate any reports of theft from Ms. Medley, counsel has been unable to locate any such reports.  Clearly the government is in a much better position to say whether any such reports exist.  However, based on the evidence before it the allegations of theft by multiple neighbors and relatives exist only in Ms. Medley's mind.

The government attorney also asked Ms. Medley about what the person named Ken was trying to sell her.  Ms. Medley indicated that this man was trying to sell her ". . . them green things that everybody is talking about.  You know, people buy them.  The rich people buy them." (Transcript of the Videotaped Deposition of Doris Medley p. 31).  She also indicated that she did not want to buy the things "[b]ecause I know people who have brought them.  It was the same kind as that woman that makes the mayonnaise.  What's her name?  She makes mayonnaise. (Transcript of the Videotaped Deposition of Doris Medley p. 31).  It is impossible to discern

what Ms. Medley was speaking of.  What are the green things Ms. Medley claims this man was

attempting to sell her.  On the record before the Court the green things that the woman who

makes mayonnaise brought exists only in Ms. Medley's mind.

Significantly, Ms. Medley was asked questions about the person named Ken and whether

she had signed any checks when he visited her.  Her answer was "[n]o.  If I did, I don't

remember.  And I haven't gotten any younger.  Now last week somebody stole money from me.

They'll take my money any time they feel like it." (Transcript of the Videotaped Deposition of

Doris Medley p. 34).  This was a question that goes to the heart of the government's case and

Ms. Medley answered the question incorrectly, if the government's claims are true.  She also

made an allegation that someone had stolen from her the week prior to December 22, 2005.

Ms. Medley was also did not identify Mr. Baker as the person named Ken who came to visit her.

She had ample opportunity to do so.  She was permitted to move around the courtroom and take

a careful look at all the people present, and although she was able to get a careful look at Mr.

Baker she did not identify him.  Furthermore, when asked whether she had been interviewed

about the subject banking transactions she indicated that someone had called her, but she wasn't

sure who.  Additionally, when asked about whether she had spoken to Agent Jean Sneezy[sic]

she indicated that Jean Sneezy[sic] was her niece.  Agent Sneezy[sic] is one of the FBI Agents

investigating the subject case, who interviewed Ms. Medley. (Transcript of the Videotaped

Deposition of Doris Medley p. 59).   In the transcript of the deposition there are many instances

demonstrating that Ms. Medley is unable to distinguish between truth and fiction.  Ms. Medley is

clearly a very proud woman who wants to tell the truth but is simply no longer able to do so

because of her illness.  Ms. Medley has been questioned a number of times about the subject

incident and it is now impossible to tell whether the testimony she is giving is the result of

information given to her by those questioning her.

I.      DUE TO MS. MEDLEY'S MEDICAL CONDITION SHE IS NOT ABLE TO
        DISTINGUISH BETWEEN TRUTH AND FICTION AND IS THEREFORE NOT
        COMPETENT TO BE A WITNESS.

As a threshold matter the determination of the competency of a person to be a witness at

a criminal trial is a matter for the trial court. *United States v. Crosby*, 463 F. 2d 1201, 1202

(D.C. Cir. 1972). The Court has a duty to protect witnesses from undue harassment or

embarrassment, but this duty must be weighed against the duty to exclude any witness who is not

competent to testify. *Id.* The determination of competency of a witness must be measured on a

sliding scale depending on the importance of the witness. Where the witness is a key witness as

in this case, the Court must apply a strict standard. A careful examination is necessary to

determine the extent to which the witness' memory and other rational faculties have been

impaired. *Hansford v. United States*, 365 F.2d 920, 924 (D.C. Cir. 1966).

Competency depends on the witness' capacity to observe, remember, and narrate as well

as an understanding of the duty to tell the truth. It also requires an assessment of the potential

prejudicial effects of allowing the jury to hear the testimony. "There is a real danger of

contrivance or imagination - - the events may seem real . . . even though they exist in [the

witness'] mind. Yet that testimony may arouse enough sympathy to make an innocent man the

real victim." *United States v. Hilton Benn, Jr.*, 476 F.2d 1127, 1130 (D.C. Cir. 1972).

In the instant matter Ms. Medley's memory is so impaired as to make her testimony so unreliable

that it must be excluded. As indicated above Ms. Medley is incapable of distinguishing between

that which is real and that which exist only in her mind. Such as her age, the number of times

people have stolen from her, or whether she authorized the checks that are the subject of this

case.  Furthermore, as is clear from the transcript of the deposition, Ms. Medley does not know

what if anything was taken from her.  (Transcript of the Videotaped Deposition of Doris Medley

p. 36).  When the Court considers that the man the government claims defrauded Ms. Medley

was sitting in the Courtroom on the day of her deposition and she was unable to identify Mr.

Baker as the man she knew as Ken, and the fact that the bank officials and the FBI contacted Ms.

Medley and told her that she had been defrauded the testimony she offers becomes highly

suspect.  Furthermore, when the Court considers the admonition of the *Hilton Benn* court that

such testimony may arouse enough sympathy to make an innocent man the victim, the Court

cannot permit the testimony of Ms. Medley to be presented to the jury.

## CONCLUSION

For the foregoing reasons and any other, which may appear at a hearing on this motion,

Ms. Medley's testimony should be precluded from the trial in this matter.  Mr. Baker request a

hearing on this matter at which time Dr. Guinta will offer testimony in support of this motion.

Respectfully submitted,

_____/s/_____
James W. Beane, Jr.

2715 M Street, N.W.
Suite 200
Washington, DC  20007
202-333-5905

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Motion, has been served upon

Assistant United States Attorney, Barbara E. Kittay, Esquire, via the Court's ECF system.

Respectfully submitted,

_____/s/_____
James W. Beane, Jr.